1

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **MARIANELA MENA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | Case No.: |
| v. | § | |
| | § | |
| **AON RISK SERVICES SOUTHWEST INC., AON SERVICE CORPORATION, AND AON PLC** | § § | **TRIAL BY JURY DEMANDED** |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Marianela Mena, (hereinafter "Plaintiff"), complains of Aon Risk services Southwest Inc., Aon Service Corporation, and Aon PLC (hereinafter "Aon" or "Defendants") and for cause of action would show the Court as follows:

### INTRODUCTION

1. Plaintiff demands a jury trial in this case as to any and all issues triable to a jury.

2. Plaintiff files this Complaint and complains of sex discrimination, hostile environment, and retaliation under Title VII of the Civil Rights Act of 1964, as amended.

---

[1] For the Court's information, Plaintiff's counsel who prepared this document, Edwin Villa, is visually impaired, and uses assistive technology when drafting documents. In particular, counsel relies on screen reader technology, which reads aloud as the document is being typed. As a result, certain typos and formatting issues are difficult to recognize. Therefore, please forgive any such issues in this document.

3. This action seeks compensatory and punitive damages, plus lost wages (past, present, and future), attorney's fees, emotional distress and mental anguish, taxable court costs, pre-judgment and post-judgment interest.

## PARTIES

4. Plaintiff, Marianela Mena, is a resident of Houston, Texas.

5. Defendant Aon Risk Services Southwest Inc. is a corporation authorized to do business in the state of Texas and process may be served by mail or in person on its registered agent, Prentice Hall Corporation System, located at 211 E. 7th Street Suite 620, Austin, TX 78701-3218.

6. Defendant Aon Service Corporation is a Texas Foreign For-Profit corporation authorized to do business in the state of Texas and process may be served by mail or in person on its registered agent, Corporation Service Company Dba Csc - Lawyers Incorporating Service Company, located at 211 E. 7th Street Suite 620, Austin, TX 78701-3218.

7. Defendant Aon PLC is a public limited company incorporated in the United Kingdom with its headquarters and principal place of business in Chicago, Illinois. Defendant Aon PLC may be served with process by mail or in person through the Illinois Secretary of State.

## VENUE

8. Venue is appropriate in the United States District Court for the Southern District of Texas—Houston Division in that Defendants' Houston office in which Plaintiff worked is located in this district and division. Therefore, Defendants can be said to reside/or do business in this district and division as required under 28 U.S.C. § 1391.

## JURISDICTION

9. This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) under the Civil Rights Act of 1964, as amended.

10. The unlawful employment practices were committed within the jurisdiction of this Court.

## PROCEDURAL REQUISITES

11. All conditions precedent to the filing of this action have been met by Plaintiff in that she has filed a timely complaint with the Equal Employment Opportunity Commission ("EEOC") and has received a right-to-sue letter from said agency to pursue her claims.

12. Plaintiff filed a Charge of Discrimination against Defendants with the EEOC on or about May 29, 2018.

13. Plaintiff was issued a Notice of Right to Sue letter from the EEOC, entitling her to file suit on her claims of discrimination based on sex, hostile environment, and retaliation on or about May 29, 2019.

14. The filing of this lawsuit has been accomplished within ninety (90) days of Plaintiff's receipt of notice from the EEOC.

## FACTS

15. Plaintiff is a female.

16. Plaintiff began working for Defendants on February 16, 2015 at Defendants' Houston office located at 5555 San Felipe Street, Suite 1500, Houston, Texas 77056.

17. At the time of Plaintiff's termination her job title was, "Vice President Account Executive."

18. Plaintiff's specific duties included, but were not limited to, providing strategic advice and counseling to colleagues and clients, helping to design and implement strategies consistent with the clients' identified risk management goals and objectives, and growing her business by engaging new clients and identifying business opportunities.

19. In June 2015, Plaintiff met David Lopez, Global Risk Manager of Grupo Alfa, a large client of Defendants.

20. In May of 2016, Plaintiff was made the broker of record for BPZ Energy, a subsidiary of Grupo Alfa.

21. As the broker of record for BPZ Energy, Plaintiff personally worked with David Lopez, which included two business trips to Lima, Peru and one to London.

22. While working with Mr. Lopez on the BPZ Energy account from May of 2016 to October 2017, Plaintiff witnessed Mr. Lopez engage in numerous examples of inappropriate sexual behaviors.

23. From June 2017 to October 2017, Plaintiff then worked with Mr. Lopez on the transferring of all of Defendants' associated Alfa policies to Defendants' Houston office, which would generate over a million dollars in revenue to Defendants' Houston office.

24. In October 2017, Plaintiff went on a business trip to London with Mr. Lopez.

25. While in London, Mr. Lopez constantly discussed sexually explicit content with Plaintiff, all while Plaintiff asked him to stop.

26. While in London, Plaintiff was finalizing the deal with Mr. Lopez where all Alfa policies would be moved to the Defendants' Houston office.

27. During these discussions, Mr. Lopez told Plaintiff that if Plaintiff wanted to keep Mr. Lopez happy, and thereby ensure Defendants' acquisition of Grupo Alfa's business, Plaintiff must have sex with Mr. Lopez.

28. Mr. Lopez made the same comment to Plaintiff multiple times while on the London business trip. Plaintiff refused.

29. After returning to Houston, Mr. Lopez continued to sexually harass Plaintiff, including a series of text messages telling Plaintiff if she wanted additional business, she needed to provide sexual favors to Mr. Lopez.

30. On October 23, 2017, in a series of text messages with Tracey Erwin, a member of Defendants' management and Executive Committee, Plaintiff discussed the extremely inappropriate AON office behavior which, violated Defendants' Code of Business Conduct, engaged in by male coworker Jimmy Winters.

31. It was well known by Ms. Erwin and other members of the Executive Committee and management that Mr. Winters repeatedly engaged in serious widespread and pervasive offensive behavior at the Defendants' Houston office which violated Defendants' Code of Business Conduct and created a sexually hostile work environment.

32. Jimmy Winters would repeatedly, without permission, use other coworkers' computers to post or send sexually explicit or racist messages while impersonating the coworker whose computer Mr. Winters was using.

33. One such occasion involved Jimmy Winters posting on a fellow coworker's Facebook page "I'm feeling so much better now that I've officially come out of the closet."

34. In another incident, Mr. Winters took a coworker's cell phone from the coworker's desk without permission and sent an offensive text message to that coworker's mother.

35. Jimmy Winters also regularly used highly offensive language in the workplace, for example referring to another coworker as "my favorite pussy" or "my favorite Muslim Terrorist" and asking that coworker to not "blow us up" because this coworker is of Middle Eastern descent.

36. In one of the most outrageously offensive acts in which Mr. Winters created a hostile work environment, while at the same time violating Defendants' Code of Business Conduct, Mr. Winters would constantly harass male employees while the male employees would go to the bathroom. Mr. Winters would grab the employee's legs under the bathroom stall and shake the doors of the bathroom stalls. These incidents were discussed within the office so that female employees would know all about them too.

37. Mr. Winters would take pictures of one particular employee as he urinated, and finally, going as far as creating a website dedicated to this employee's trips to the restroom where these pictures were posted.

38. Mr. Winters would make homophobic remarks to a male coworker calling him a "faggot" and to "just come out of the closet already." Mr. Winters, without permission, went into a female coworker's computer and emailed several emails to said male coworker saying, "Your zipper is down," "Your beard is sexy," "I think you're handsome, do you have a boyfriend". All of these incidents occurred on the premises of the Defendants' Houston office and were severe and pervasive and highly offensive to Plaintiff and others, yet condoned by Bruce Jefferis, CEO of Global Energy.

39. Mr. Winters commonly engaged in sexually charged, homophobic, racist, completely offensive actions meant to humiliate the victimized coworker, and these actions created an extremely hostile work environment at Defendants' Houston location and were clearly in direct violation of Defendants' Code of Business Conduct, which "specifically emphasizes that Defendants will "not tolerate harassment of any kind, including sexual… or any other kind of behavior that is… humiliating,"

40. Not only were numerous members of Defendants' Executive Committee and management aware of these unacceptable and hostile behaviors, but Mr. Winters himself is a member of management and a member of the Executive Committee, being that he is Defendants' Regional Sales Director.

41. Defendants failed to take any prompt remedial measures to protect Plaintiff and the other coworkers from this hostile behavior, nor was Mr. Winters terminated for his numerous, blatant, substantiated violations of Defendants' Code of Business Conduct.

42. Instead, according to Defendants, Mr. Winters violations were taken "very seriously" and "issued Mr. Winters a final written warning regarding his behavior, a reminder of his obligation to comply with Aon's Code of Conduct, Anti-Harassment and Discrimination Policy, and Appropriate Use of Technology Policies, and warned him that his 2019 compensation could be impacted as a result of his conduct, and if during the course of his employment there is another substantiated violation of any part of Aon's Code of Business Conduct or any Aon policy addressing appropriate workplace conduct, his employment relationship with Aon may be impacted, up to and including termination."

43. These types of actions were so prevalent at Defendants' Houston location that yet another unacceptable incident, this time involving a member of Defendants' management and Executive Committee, Thane Wyman, went unpunished.

44. This incident involved another male coworker improperly gaining access to another employee's computer without permission and sending Mr. Wyman a homosexually charged message from that employee's computer, which stated, "I think about you all the time, I even think about you in the shower."

45. However, given this egregious violation of Defendants' Code of Business Conduct, Mr. Wyman dismissed the male perpetrator by stating that he was just acting like a juvenile.

46. This is another example of Defendants turning a blind eye regarding the blatant violations of Defendants' Code of Business Conduct by male employees.

47. During a text message conversation with Mr. Lopez beginning on October 23, 2017 and ending on October 26, 2017, Plaintiff was again told by Mr. Lopez that if Plaintiff wanted to finalize the transfer of policies to the Houston office then Plaintiff would have to have sex with Mr. Lopez.

48. After Plaintiff's continued rejections of Mr. Lopez's sexual advances, the business relationship with Mr. Lopez faltered. Plaintiff was concerned with being unable to finalize the potentially lucrative deal for Defendants.

49. In early December of 2017, Plaintiff was cornered and verbally attacked by male coworker Paul Foreman. During this incident, which was brought on by a mere difference of opinion regarding a work issue, Mr. Foreman yelled at Plaintiff and questioned Plaintiff's work performance by stating "Who the hell do you think you are?" This was a common offensive way that men talked to women at the Defendants' Houston office.

50. On December 7, 2017, in a series of text messages, Plaintiff let her team leader and member of management, Elias Sakellakis, know about the attack by Paul Foreman.

51. In these text messages, Mr. Sakellakis himself voices his disapproval of Mr. Foreman's behavior and states that Mr. Foreman "is out of control sometimes or at all times."

52. Mr. Sakellakis continues by stating that Mr. Foreman's behavior is already known and that it is "not fair that he talks to us like that."

53. In this text message, Mr. Sakellakis also agrees with Plaintiff's characterization of the interaction with Mr. Foreman as an "attack. Rather than addressing this issue himself, Mr. Sakellakis asked that Plaintiff let Tracey Erwin know of the attack, which Plaintiff subsequently did.

54. Defendants' management was aware of Mr. Foreman's behavior in late 2017, and yet chose not to act in any way against Mr. Foreman's behavior until after April of 2018.

55. In no way was Defendants' response to the knowledge of Mr. Foreman's blatant violations of Defendants' Code of Business Conduct prompt or effective.

56. Given Mr. Foreman's repeated violations of Defendants' Code of Business Conduct and his reputation of being out of control, Mr. Foreman was not terminated.

57. Instead, Defendants provided Mr. Foreman with an oral warning, written coaching, and a reminder that he was expected to always communicate with colleagues in a professional manner, and continued conduct of this nature may result in further disciplinary action.

58. An oral warning, written coaching, and a reminder are a far cry from the emphasis of not tolerating any disrespect, hostility, or abuse from an employee laid out in Defendants' Code of Business Conduct.

59. While Mr. Sakellakis agreed that Mr. Foreman's actions were unacceptable, Mr. Sakellakis himself was also guilty of contributing to the highly offensive hostile work environment at Defendants' Houston location as well.

60. For instance, Mr. Sakellakis took a screenshot of a picture posted on a coworker's Facebook page where that coworker had unintentionally posted a picture where that coworker's genitalia was visible on a reflection of a trophy that was in the picture. When the coworker was made aware of the presence of this reflection, he immediately took the

picture down from his Facebook page. However, Mr. Sakellakis proceeded to share the screenshot he had taken of this photo to many other coworkers.

61. This is yet another example of a male member of Defendants' management clearly violating Defendants' Code of Business Conduct, thereby contributing to the already hostile work environment at Defendants' Houston location, and yet, this male employee was not terminated.

62. In late January of 2018, Plaintiff first discussed the David Lopez incident with a member of Defendants' management, Bill Farnan.

63. During this conversation, Plaintiff voiced to Bill Farnan that Plaintiff was afraid to come forward to Defendantsregarding the sexual harassment Plaintiff suffered at the hands of Defendants' client, Mr. Lopez, because Plaintiff was concerned that Defendants would not do anything about it because of the hostile work environment that has been present at Defendants' Houston office for years, or worse, that Defendants would retaliate against Plaintiff (as they eventually did, by firing her) for raising said issues.

64. During this conversation, Bill Farnan stated that he had an obligation to report and immediately inform management about Plaintiff's concerns, and that Mr. Farnan took Plaintiff's concerns very seriously.

65. On February 7, 2018, Plaintiff met with Resident Managing Director, Thane Wyman, to discuss the sexual harassment Plaintiff suffered and the hostile work environment at Defendants' Houston office.

66. During this conversation, Mr. Wyman advised Plaintiff that he would report Plaintiff's concerns to Janet Hollcroft, Defendants' Regional HR contact, and Defendants' Regional Managing Director Southwest, Charles Philpott; Mr. Wyman would inform Defendants'

CEO of Global Energy, Bruce Jefferis; Mr. Wyman would inform Defendants' Head of Energy Department, David Mittelholzer; Mr. Wyman would also inform members of Defendants' management, Tracey Erwin, and Elias Sakellakis as well.

67. After the conversation with Mr. Wyman on February 7, 2018, Plaintiff was retaliated against for raising the harassment and discrimination issues and was isolated by members of Defendants' management, refusing to speak to Plaintiff in person and only corresponding with Plaintiff through limited emails.

68. On February 9, 2018, Plaintiff was contacted by Nancy Solorio of Defendants' HR Connect department, and Ms. Solorio advised Plaintiff that Ms. Solorio was designated to assist Plaintiff with Plaintiff's complaints.

69. Throughout the month of February and March, Plaintiff partook in numerous conversations with Ms. Solorio, other members of Defendants' HR department, and members of Defendants' legal department, regarding the incident with Mr. Lopez, the incident with Paul Foreman, the repeated offensive behaviors of Jimmy Winters, and the overall hostile work environment of Defendants' Houston office.

70. On February 16, 2018, Plaintiff emailed Tracey Erwin and Elias Sakellakis regarding the discrepancies in Plaintiff's annual review scores, specifically that Plaintiff's 2016 review score was lower than what Plaintiff was previously told.

71. On February 16, 2018, on a phone call with Ms. Solorio, Plaintiff was told by Ms. Solorio that it is recommended that in the immediate future Plaintiff not be aligned with Mr. Lopez.

72. On February 21, 2018, on a phone call with Ms. Solorio, Plaintiff asked Ms. Solorio if there had been a glitch in the system. Plaintiff advised Ms. Solorio that while Plaintiff

was inputting her 2018 goals, Plaintiff noticed her previous year review scores had changed.

73. On February 23, 2018, Mr. Wyman advised Plaintiff that HR concluded the sexual harassment investigation regarding Mr. Lopez, and that the HR department concluded that Plaintiff was sexually harassed by Mr. Lopez.

74. On February 26, 2018, on a phone call with Ms. Solorio, Plaintiff was again told that the HR investigation into Plaintiff's complaint regarding Mr. Lopez had concluded and that the HR department had indeed found that Plaintiff was sexually harassed by Mr. Lopez.

75. During this conversation, Plaintiff was told by Ms. Solorio that Defendants would be taking immediate steps to ensure that Plaintiff no longer had to work with Mr. Lopez. Little did Plaintiff know that this meant Defendants' plan was to retaliate and fire her.

76. Unfortunately, Defendants did not promptly remove Plaintiff from Mr. Lopez and the Grupo Alfa accounts.

77. While Plaintiff was told by Ms. Solorio that the investigations into Defendants' hostile work environment were confidential, on March 2, 2018, Jimmy Winters invited two female employees to coffee and discussed how Aon was a great place, with great people, whom Mr. Winters loves working with. Mr. Winters specifically named Charles Philpott, Tracey Erwin, Thane Wyman and Bruce Jefferis. Mr. Winters at one point told both women that "some people might not like the job or the industry [referring to Plaintiff] and that it's not for everyone and that's ok". These two female coworkers were named by Plaintiff to Ms. Solorio as individuals who could verify Plaintiff's claims of Defendants' hostile work environment and Winters was trying to win-over their testimony.

78. On March 1, 2018, on a phone call with Ms. Solorio, Plaintiff again advised Ms. Solorio of her previous year review score change concerns and Ms. Solorio suggested Plaintiff contact her managers. Plaintiff advised she had already emailed Tracey Erwin and Elias Sakellakis on February 16, 2018 about the discrepancies and had not received a response. Ms. Solorio advised Plaintiff to follow up with her managers, which Plaintiff subsequently did.

79. On March 5, 2018, Plaintiff was concerned that her 2017 yearly review meeting was not yet scheduled. Plaintiff inquired with team members about scheduling. Plaintiff's team members confirmed with Plaintiff that team leader, Elias Sakellakis, sent a calender invite on or about February 26, 2018, scheduling the team's reviews for March 8, 2018.

80. On March 5, 2018, upon review of Plaintiff's team's shared outlook calender, Plaintiff sees all team members, except herself, were scheduled for their reviews, with Elias Sakellakis, for March 8, 2018.

81. On March 5, 2018, Plaintiff emailed Ms. Solorio about Plaintiff's concerns with the previous year review score changes, non-responsive managers with regard to questions about Plaintiff's review scores, and fear of retaliation.

82. On March 7, 2018, Plaintiff finally received a calendar invite from Tracey Erwin and David Mittelholzer, requesting to schedule Plaintiff's review meeting for March 9, 2018.

83. Plaintiff asked Ms. Erwin if Elias Sakellakis will be joining the review meeting, as he is Plaintiff's direct team leader. Ms. Erwin advised Plaintiff that Mr. Sakellakis is unavailable to attend, and it will only be Ms. Erwin and Mr. Mittelholzer in attendance.

84. On March 9, 2018, Plaintiff had her 2017 annual review with Tracey Erwin and David Mittelholzer, but Elias Sakellakis, Plaintiff's direct team leader, was not present.

85. However, Mr. Sakellakis was present for all other employees' annual reviews that Mr. Sakellakis was a team leader to.

86. During this review, and after Plaintiff complained of discrimination and sex harassment, Plaintiff was made aware for the first time of Plaintiff's alleged performance issues.

87. After the 2017 annual review, Ms. Erwin began to treat Plaintiff differently from other employees by changing Plaintiff's work duties, implementing different working hours, and requiring management approval for otherwise routine matters.

88. On March 15, 2018, Plaintiff experienced a panic attack at work because Mr. Lopez was attempting to reach her on both her office line and work cell phone, but Plaintiff was not comfortable speaking to Mr. Lopez.

89. On March 28, 2018, Plaintiff attended a meeting with members of Defendants' management, Thane Wyman and Tracey Erwin, to finally discuss Plaintiff being replaced as the employee who worked on Mr. Lopez's accounts.

90. On April 3, 2018, Plaintiff was advised by Ms. Solorio that the investigation into Defendants' hostile work environment and Plaintiff's claims of retaliation was concluded, and that appropriate action had been taken in accordance with the outcome of the investigation.

91. On April 9, 2018, Plaintiff was advised by Bruce Jefferis that Defendants' HR department had finally corresponded with Grupo Alfa, and Grupo Alfa would not be making any changes to their insurance personnel or responsibilities. Bruce Jefferis advised Plaintiff, however, that it would be about a week before Defendants communicated anything officially to Grupo Alfa.

92. On April 16, 2018, Plaintiff was terminated under the pre-text that Plaintiff had violated Defendants' Code of Business Conduct, by allegedly sharing disparaging comments (which Plaintiff knew she did not) about Defendants to Defendants' client, Crestwood Midstream Partners.

93. Plaintiff never received a final written warning nor was she warned of possible effects on her salary, but instead was just terminated, unlike her fellow male coworkers, Jimmy Winters and Paul Foreman who Defendants admit repeatedly violated Defendants' Code of Business Conduct, as well as the numerous other male employees who similarly violated Defendants' Code of Business Conduct.

## COUNT I

### DISCRIMINATION BASED ON SEX UNDER TITLE VII

94. Plaintiff re-alleges and incorporates into count one, paragraphs 1-93.

95. Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs and usages made unlawful by Title VII, as amended, and directly discriminated against Plaintiff because of her sex, by harassing her and firing her due to her sex, while at the same time, failing to terminate male employees who egregiously violated company policy.

96. Defendants, by and through their agents, have maintained a policy of sex discrimination in violation of the foregoing statute against Plaintiff.

97. If Plaintiff were not female, she would not have been harassed, treated poorly, and unlawfully discharged.

## COUNT II

### HOSTILE WORK ENVIRONMENT HARASSMENT UNDER TITLE VII

98. Plaintiff re-alleges and incorporates into count two, paragraphs 1-93.

99. Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs and usages made unlawful by Title VII, as amended, and directly failed to protect Plaintiff from a hostile work environment.

100. Defendants, by and through their agents, have maintained a hostile work environment in violation of the foregoing statute against Plaintiff.

101. Defendants failed to protect Plaintiff from a hostile work environment by failing to take prompt remedial action to protect Plaintiff from her known sexual harasser, David Lopez.

102. Defendants failed to protect Plaintiff from a hostile work environment by failing to take prompt remedial action to protect Plaintiff from the severe and pervasive vile and offensive behavior, previously discussed, by Jimmy Winters, Paul Foreman, and other male employees.

## COUNT III

### TERMINATION ON THE BASIS OF SEX

103. Plaintiff re-alleges and incorporates into count three paragraphs 1-93.

104. Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs and usages made unlawful by Title VII, as amended, because of Plaintiff's sex.

105. Defendants, acting by and through their employees, maintained a policy of sex discrimination, in violation of the foregoing statutes against Plaintiff.

106. If Plaintiff was not female, she would not have been terminated.

## COUNT IV

### TERMINATION ON THE BASIS OF RETALIATION

107. Plaintiff re-alleges and incorporates into count four paragraphs 1-93.

108. Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs and usages made unlawful by Title VII, as amended, because of their retaliation for complaints of sex discrimination, hostile environment, and retaliation.

109. Defendants, acting by and through their employees, maintained a policy of retaliation, in violation of the foregoing statutes against Plaintiff.

110. If Plaintiff had not complained of sex discrimination, hostile environment, and retaliation, she would not have been terminated.

## DAMAGES

111. As a direct and proximate result of the aforementioned acts, Plaintiff has suffered loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress.

## EXEMPLARY DAMAGES

112. Defendants' actions were intentional, willful, harsh, oppressive, reckless and malicious, and as a further and proximate cause, Plaintiff has suffered severe emotional distress, pain and suffering. The wrongs done by Defendants were aggravated by their willfulness, wantonness and maliciousness for which the law allows the imposition of exemplary damages. Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter Defendants from such conduct in similar situations.

## ATTORNEY'S FEES

113. Defendants' actions and conduct as described herein and the resulting damage and loss to Plaintiff has necessitated Plaintiff's retaining the services of COANE AND ASSOCIATES, PLLC, in order to initiate this proceeding. Plaintiff seeks recovery of reasonable and necessary attorney's fees.

## JURY DEMAND

114. Plaintiff hereby makes her request for a jury trial.

## PRAYER

115. WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendants be cited to appear and answer, and that on final hearing of this cause, Plaintiff has the following relief:

   a. Back Pay;

   b. Pre-Judgment Interest on Back Pay;

   c. Front Pay;

   d. Compensatory Damages, including but not limited to emotional distress;

   e. Punitive Damages;

   f. Injunctive and Affirmative Relief;

   g. Attorney's Fees and Costs;

   h. Such other and further relief, at law or in equity, general or special, to which Plaintiff may show she is justly entitled.

Dated: July 17, 2019

Respectfully submitted,

**COANE AND ASSOCIATES, PLLC**

*/s/Bruce Coane*

Bruce A. Coane, Attorney-in-Charge
S.D. Tex. #7205
TX Bar #04423600
Email: bruce.coane@gmail.com
Edwin E. Villa
S.D. Tex. #3339324
TX Bar #24110485
Email: edwin.villa@coane.com
Coane and Associates, PLLC
5177 Richmond Ave., Suite 770
Houston, TX 77056
Telephone: 713-850-0066
Facsimile: 713-850-8528

*ATTORNEYS FOR PLAINTIFF*