## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MARIANELA MENA, | § | |
| | § | |
| **Plaintiff,** | § | **Case No.: 4:19-cv-02595** |
| v. | § | |
| | § | |
| AON RISK SERVICES SOUTHWEST, | § | **JURY TRIAL DEMANDED** |
| INC., AON SERVICE CORPORATION, | § | |
| AON PLC, AND BRUCE JEFFERIS | § | |
| | § | |
| Defendants. | § | |

---

## FIRST AMENDED COMPLAINT

---

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Marianela Mena, (hereinafter "Plaintiff"), complains of Aon Risk Services Southwest, Inc., Aon Service Corporation, Aon PLC, and Bruce Jefferis and for causes of action would show the Court as follows:

### INTRODUCTION

1. Plaintiff demands a jury trial in this case as to any and all issues triable to a jury.

2. Plaintiff files this First Amended Complaint and complains of retaliation, hostile work environment, and sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, and defamation and slander under Texas law. [No answer has been filed in this case. Plaintiff is entitled to file this First Amended Complaint without leave of court.]

3. This action seeks compensatory, general, special and punitive damages, including lost wages (past, present, and future), attorney's fees, emotional distress and mental anguish, taxable court costs, pre-judgment and post-judgment interest.

## PARTIES

4.      Plaintiff, Marianela Mena, is a resident of Houston, Texas.

5.      Defendant Aon Risk Services Southwest, Inc. is a corporation authorized to do business in the State of Texas and a Waiver of Service of Summons has been filed on its behalf, thereby allowing service of a copy of this First Amended Complaint upon its counsel of record, Nehal S. Anand, 1301 McKinney St., Suite 1900, Houston, Texas 77010.

6.      Defendant Aon Service Corporation is a corporation authorized to do business in the State of Texas and a Waiver of Service of Summons has been filed on its behalf, thereby allowing service of a copy of this First Amended Complaint upon its counsel of record, Nehal S. Anand, 1301 McKinney St., Suite 1900, Houston, Texas 77010.

7.      Defendant Aon PLC is a public limited company incorporated in the United Kingdom with its headquarters and principal place of business in Chicago, Illinois.  Defendant Aon PLC may be served with process through Bruce Jefferis, Chief Executive Officer of its Houston office, at 5555 San Felipe, #1500, Houston, Texas  77056.

8.      Defendant Bruce Jefferis is the Chief Executive Officer of the Houston office of Aon Risk Services Southwest, Inc. and Aon Global Energy at AON PLC.  Defendant Jefferis may be served with process at his place of business, Aon Risk Services Southwest, Inc., 5555 San Felipe, Suite 1500, Houston, Texas  77056.

## VENUE

9.      Venue is appropriate in the United States District Court for the Southern District of Texas—Houston Division in that Defendants' Houston office in which Plaintiff worked is located in this district and division and Plaintiff's causes of action accrued or arose in

2

this district and division. Defendants reside/or do business in this district and division as required under 28 U.S.C. § 1391.

## JURISDICTION

10. This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) under the Civil Rights Act of 1964, as amended. This Court has supplemental jurisdiction over Plaintiff's Texas state law claim. All of Plaintiff's causes of action arise from Defendants' conduct committed in Texas, allowing exercise of personal jurisdiction over Defendants by this Court.

11. The unlawful employment practices, defamation and slander were committed within the jurisdiction of this Court.

## PROCEDURAL REQUISITES

12. All conditions precedent to the filing of this action have been met by Plaintiff in that she has filed a timely complaint with the Equal Employment Opportunity Commission ("EEOC") and has received a right-to-sue letter from said agency to pursue her claims.

13. Plaintiff filed a Charge of Discrimination against Defendants with the EEOC on or about May 29, 2018, and Plaintiff was issued a Notice of Right to Sue letter from the EEOC, entitling her to file suit on her claims on or about May 29, 2019.

14. The filing of this lawsuit was accomplished within ninety (90) days of Plaintiff's receipt of notice from the EEOC.

## FACTS

15. Plaintiff is a female who began working for Defendant Aon Risk Services Southwest, Inc. on February 16, 2015, at Defendants' Houston office located at 5555 San Felipe

Street, Suite 1500, Houston, Texas 77056.  At the time of Plaintiff's termination her job title was "Vice President Account Executive" for Aon Risk Services Southwest, Inc.

16. Plaintiff's specific duties included, but were not limited to, providing strategic advice and counseling to colleagues and clients, helping to design and implement strategies consistent with the clients' identified risk management goals and objectives, and growing her business by engaging new clients and identifying business opportunities.

17. Defendants Aon Risk Services Southwest, Inc., Aon Service Corporation and Aon PLC all operate from the office at 5555 San Felipe Street, Suite 1500, Houston, Texas 77056. The acts complained of were committed by employees of these Defendant entities operating from that office location.  Further, the employment of various persons involved in the acts complained of are employed by or act on behalf of multiple Aon entities.

## REFUSAL TO PERFORM ILLEGAL ACTS

18. During Plaintiff's employment with Defendants, Plaintiff disclosed the commissions to be earned by Defendants on business being placed.  That disclosure of commissions was in accordance with the legal requirements for Defendants to disclose to customers, before the customer's purchase of the insurance, all compensation to be received by Defendants.  See, Section 4005.004 (6)(b) of the Texas Insurance Code, "Disclosure of Compensation".

19. Plaintiff, however, was reprimanded by Paul Finnett, a member of management of Defendants, for disclosing to a client this legally required information regarding commissions to be received by Defendants.

4

20.     Bruce Jefferis, CEO of the Houston office of Defendants, ratified and approved the conduct of Finnett, advising Plaintiff that he had heard about the issue regarding her disclosure of the commissions and supported Finnett. As Plaintiff learned over time with Defendants, non-disclosure of commissions by Defendants was an on-going issue within the Aon companies.

21.     In addition to the improper reprimand by Finnett and Jefferis' ratification of the illegal conduct, Plaintiff raised the issue of the non-disclosure of commissions with Tracey Erwin, a Managing Director and member of Defendants' Executive Committee.  Despite Plaintiff raising the issue of the improper nondisclosure of commissions by Defendants, Erwin took no action in response.

22.     Similar to the non-disclosure of direct commissions to be earned by Defendants, a similar non-disclosure issue related to Defendants' Subscription Market Agreements where Defendants were to receive additional "backdoor" commissions related to the placing of insurance with groups of underwriters.  Plaintiff's questioning of the client disclosure practices regarding these "backdoor" commissions was yet another source of friction for Plaintiff at her employment.

### HOSTILE WORK ENVIRONMENT

23.     On October 23, 2017, in a series of text messages with Tracey Erwin, a member of Defendants' Executive Committee, Plaintiff discussed the extremely inappropriate AON office behaviors which violated Defendants' Code of Business Conduct. The complained of conduct was engaged in by male coworkers, including Jimmy Winters, Thane Wyman and Elias Sakellakis.

5

24.   It was well known by Erwin and other members of the Executive Committee and Aon management that Winters and others repeatedly engaged in serious widespread and pervasive offensive behavior at the Defendants' Houston office which violated Defendants' Code of Business Conduct and created a sexually hostile work environment.

25.   As an example, Winters would repeatedly, without permission, use other coworkers' computers to post or send sexually explicit or racist messages while impersonating the coworker whose computer Winters was using.

26.   One such incident involved Winters posting on a fellow coworker's Facebook page "I'm feeling so much better now that I've officially come out of the closet."   In another incident, Winters took a coworker's cell phone from the coworker's desk without permission and sent an offensive text message to that coworker's mother.

27.   Winters also regularly used highly offensive language in the workplace.  Examples are Winters referring to coworkers as "my favorite pussy" or "my favorite Muslim Terrorist" and asking that coworker to not "blow us up" because this coworker is of Middle Eastern descent.

28.   In one of the most outrageously offensive acts by which Winters created a hostile work environment, while at the same time violating Defendants' Code of Business Conduct, Winters harassed male employees while the male employees would go to the bathroom. Winters would grab the employee's legs under the bathroom stall and shake the doors of the bathroom stalls.  These incidents were discussed within the office so that female employees would know all about the incidents.

6

677286

29.   Winters' conduct went so far as his taking pictures of one particular employee as he urinated.  Winters then created a website dedicated to this employee's trips to the restroom where these pictures of him urinating were posted.

30.   Winters would make homophobic remarks to a male coworker calling him a "faggot" and to "just come out of the closet already." Winters, without permission, went into a female coworker's computer and emailed several male coworker saying, "Your zipper is down," "Your beard is sexy," "I think you're handsome, do you have a boyfriend". All of these incidents occurred on the premises of the Defendants' Houston office and were severe and pervasive and highly offensive to Plaintiff and others, yet condoned by Bruce Jefferis, CEO of the Houston office of the Aon Defendants.

31.   Winters commonly engaged in sexually charged, homophobic, and racist remarks that were offensive actions meant to humiliate the victimized coworkers.  These actions created an extremely hostile work environment at Defendants' Houston location and were clearly in direct violation of Defendants' Code of Business Conduct, which "specifically emphasizes that Defendants will "not tolerate harassment of any kind, including sexual… or any other kind of behavior that is… humiliating,"

32.   Not only were numerous members of Defendants' Executive Committee and management aware of these unacceptable and hostile behaviors, but Winters himself was a member of management and a member of the Executive Committee.

33.   Defendants failed to take any prompt remedial measures to protect Plaintiff and the other coworkers from the hostile behavior.  Winters was not terminated for his numerous, blatant, substantiated violations of Defendants' Code of Business Conduct.

34.    These types of actions were so prevalent at Defendants' Houston office. Another unacceptable incident, was condoned by Thane Wyman, also a member of Defendants' management and Executive Committee, again went unpunished.  This incident involved another male coworker improperly gaining access to another employee's computer and sending Wyman a homosexually charged message from that employee's computer, which stated, "I think about you all the time, I even think about you in the shower." Despite this egregious violation of Defendants' Code of Business Conduct, Wyman dismissed the male perpetrator's action by stating that he was just acting like a juvenile.

35.    Another example of the hostile work environment occurred in early December of 2017, when Plaintiff was cornered and verbally attacked by male coworker Paul Foreman. During this incident, Foreman yelled at Plaintiff and questioned Plaintiff's work performance by stating "Who the hell do you think you are?"  This was a common offensive way that men talked to women at the Defendants' Houston office.

36.    On December 7, 2017, in a series of text messages, Plaintiff let her team leader and member of management, Elias Sakellakis, know about the attack by Paul Foreman. In these text messages, Mr. Sakellakis himself voices his disapproval of Foreman's behavior and states that Foreman "is out of control sometimes or at all times."

37.    Sakellakis continued by stating that Foreman's behavior is already known and that it is "not fair that he talks to us like that."  In his text message, Sakellakis also agrees with Plaintiff's characterization of the interaction with Foreman as an "attack".  Rather than addressing this issue, Sakellakis advised Plaintiff to let Tracey Erwin know of the attack, which Plaintiff subsequently did.

38.   Defendants' management was aware of Foreman's behavior in late 2017, and yet chose not to act. In no way was Defendants' response to the admitted knowledge of Foreman's blatant violations of Defendants' Code of Business Conduct prompt or effective. Despite Foreman's repeated violations of Defendants' Code of Business Conduct and his reputation of being out of control, Foreman was not terminated and his conduct was not stopped.

39.   While Mr. Sakellakis agreed that Foreman's actions were unacceptable, Sakellakis himself was also guilty of contributing to the highly offensive hostile work environment. Sakellakis took a screenshot of a picture posted on a coworker's Facebook page where that coworker had unintentionally posted a picture where that coworker's genitalia was visible on a reflection. When the coworker was made aware of the presence of this reflection he immediately took the picture down from his Facebook page.  However, Sakellakis proceeded to share the screenshot he had taken of this photo with coworkers.

40.   This is yet another example of a male member of Defendants' management clearly violating Defendants' Code of Business Conduct, thereby contributing to the already hostile work environment at Defendants' Houston location.

**DIRECT SEXUAL HARASSMENT OF PLAINTIFF**

41.   Defendants not only knowingly allowed the hostile work environment to persist, Defendants allowed sexual harassment of its female employees.  Plaintiff was a direct victim of the sexual harassment.  In May of 2016, Plaintiff was made the broker of record for BPZ Energy, a subsidiary of Grupo Alfa.  As the broker of record for BPZ Energy, Plaintiff personally worked with David Lopez, which included two business trips to Lima, Peru and one to London.

9

42. Defendant Jefferis made clear to Plaintiff the importance of Grupo Alfa and Jefferis' desire to have all of its business moved to the Houston office of Defendants, stating that getting that business was a major deal. Defendant Jefferis specifically stated to Plaintiff that having the Grupo Alfa business moved to the Houston office of the Defendants was what would move Plaintiff to the next level at Defendant, the Senior Vice President ("SVP") level. Defendant Jefferis represented to Plaintiff that closing the Gropo Alfa deal would get her SVP.

43. From June 2017 to October 2017, Plaintiff worked with Lopez on the transferring of all of Defendants' associated Grupo Alfa insurance policies to Defendants' Houston office, which would generate over a million dollars in revenue to Defendants' Houston office.

44. During the process of finalizing these transfers, in October 2017, Plaintiff went on a business trip to London with Lopez. While in London, Lopez constantly discussed sexually explicit content with Plaintiff, all while Plaintiff asked him to stop.

45. While in London, Lopez told Plaintiff that if Plaintiff wanted to keep Lopez happy, and thereby ensure Defendants' acquisition of Grupo Alfa's business, Plaintiff must have sex with him. Lopez made the statement to Plaintiff multiple times while on the London business trip. Plaintiff refused.

46. After returning to Houston, Lopez continued to sexually harass Plaintiff, including sending a series of text messages telling Plaintiff that if she wanted the additional business, she needed to provide sexual favors to him.

47. In text messages beginning on October 23, 2017, and ending on October 26, 2017, Plaintiff was again told by Lopez that if Plaintiff wanted to finalize the transfer of policies to the Houston office then Plaintiff would have to have sex with him.

10

48. After Plaintiff's continued rejections of Lopez's sexual demands, the business relationship with Lopez and Grupo Alfa faltered. Plaintiff was worried about repercussions from Defendants if she reported the sexual harassment and demands for sex in exchange for business.

### PLAINTIFF REPORTS THE PROBLEMS TO MANAGEMENT

49. Despite Plaintiff's fear of negative repercussions, on January 31, 2018, Plaintiff reported the sexual harassment by Lopez to a member of Defendants' management, Bill Farnan.

50. During that conversation, Plaintiff told Farnan that Plaintiff was afraid to come forward regarding the sexual harassment because she feared repercussions with her job. Plaintiff stated that she was concerned that Defendants, which allowed the hostile work environment at the Houston office, would not do anything, or worse, that Defendants would retaliate against her for reporting the sexual harassment by a major client.

51. During this conversation, Farnan stated that he had an obligation to inform management about Plaintiff's complaints of sexual harassment and a hostile work environment.

52. Farnan reported the sexual harassment to additional management members and on February 7, 2018, Plaintiff was called to meet with Resident Managing Director, Thane Wyman, to discuss the sexual harassment and the hostile work environment at Defendants' Houston office. During this meeting, Wyman advised Plaintiff that he would report Plaintiff's concerns to Janet Hollcroft, Defendants' Regional HR contact; Charles Philpott, Defendants' Regional Managing Director Southwest; Bruce Jefferis, CEO of Global Energy at Aon PLC; David Mittelholzer, Head of the Energy Department; and Tracey Erwin and Elias Sakellakis, Plaintiff's direct managers. In short, Plaintiff's complaints were disclosed to the whole of management within the

11

677286

Houston office.  After the disclosure of Plaintiff's complaints, it was only two months before Plaintiff was terminated.

53.     After the conversation with Wyman on February 7, 2018, Plaintiff was retaliated against for raising the sexual harassment and hostile work environment issues.  She was isolated by members of Defendants' management, who thereafter refused to speak to Plaintiff in person and only corresponded with Plaintiff through limited emails.

54.     On February 9, 2018, Plaintiff was contacted by Nancy Solorio, an employee of Defendants' HR Connect department. Ms. Solorio advised Plaintiff that she was designated to assist Plaintiff with Plaintiff's complaints.  Throughout the months of February and March, Plaintiff had numerous conversations with Solorio, other members of Defendants' HR department, and members of Defendants' legal department, regarding the incidents with Lopez and Foreman, the repeated offensive behaviors of Winters, the overall hostile work environment of Defendants' Houston office and the issues of sexual discrimination.

**PLAINTIFF'S REVIEW SCORES**

55.     After voicing her complaints, Plaintiff discovered changes in her employment file.  On February 16, 2018, Plaintiff emailed Tracey Erwin and Elias Sakellakis regarding the discrepancies in Plaintiff's annual review scores, specifically that Plaintiff's 2016 review score was now reflected as being lower than what Plaintiff was told.  On February 21, 2018, Plaintiff advised Solorio in HR that while Plaintiff was inputting her 2018 goals, Plaintiff found that her previous year review scores were not recorded as represented to her.

12

677286

56.   On March 1, 2018, in a phone call with Ms. Solorio, Plaintiff again advised Solorio of her previous year review score change concerns. Solorio suggested Plaintiff contact her managers. Plaintiff advised that she had already emailed her managers, Erwin and Sakellakis, on February 16, 2018 about the discrepancies, but had not received a response. Solorio simply advised Plaintiff to follow up with her managers, which Plaintiff subsequently did.

## SEXUAL HARASSMENT CONFIRMED BY HR

57.   On February 16, 2018, Plaintiff was told by Solorio that HR recommended that in the immediate future Plaintiff not be associated with Mr. Lopez.

58.   On February 23, 2018, Wyman advised Plaintiff that HR completed the sexual harassment investigation regarding Lopez, and that the HR department concluded that Plaintiff was sexually harassed by Lopez.

59.   On February 26, 2018, Solorio confirmed to Plaintiff that the HR investigation into Plaintiff's sexual harassment complaint regarding Lopez had concluded and that the HR department found that Plaintiff was sexually harassed by Lopez.  Plaintiff was told that Defendants would be taking immediate steps to ensure that Plaintiff no longer had to work with Lopez.  That did not happen.

## DEFENDANTS FAIL TO MOVE LOPEZ ACCOUNTS

60.   Despite Plaintiff's reporting Lopez's sexual harassment to management in January 2018, Defendants did not promptly remove Plaintiff from having to interact with and be responsible for Lopez and the Grupo Alfa accounts.

61.   As stated above, by February 16, 2018, Plaintiff was told by Solorio that it is recommended by HR that Plaintiff not be associated with Mr. Lopez.  The sexual

13

harassment allegations made by Plaintiff were then confirmed by HR, but the account responsibility was not moved.

62.    On March 15, 2018, Plaintiff experienced a panic attack at work because Lopez called her on both her office line and work cell phone.  Plaintiff was not comfortable speaking to Lopez and despite the findings of sexual harassment, Lopez was still contacting Plaintiff.

63.    It was not until March 28, 2018, that Defendants' management, Wyman and Erwin, finally met with Plaintiff to discuss Plaintiff being replaced as the employee who worked with Lopez.

64.    On April 9, 2018, Plaintiff was advised by Bruce Jefferis that Defendants' HR department had corresponded with Grupo Alfa, but that Grupo Alfa would not be making any changes to their insurance personnel or responsibilities. Lopez would remain on the accounts. Jefferis advised Plaintiff that it would be about a week before Defendants communicated anything officially to Grupo Alfa.

## RETALIATION AND WRONGFUL DISCHARGE

65.    By March 5, 2018, Plaintiff was concerned that her annual review meeting was not yet scheduled. Plaintiff inquired with team members about the scheduling of annual reviews and learned that their team leader, Elias Sakellakis, sent a calendar invite on or about February 26, 2018, scheduling reviews for all team members, except Plaintiff.

66.    On March 5, 2018, Plaintiff confirmed that all team members, except herself, were scheduled for their reviews with Elias Sakellakis.  Upon learning this information, Plaintiff emailed Solorio in HR about her previously relayed concerns with the prior

14

year review score changes, non-responsive managers with regard to questions about Plaintiff's review scores, and her fear of retaliation.

67.     On March 7, 2018, Plaintiff received a calendar invite for her annual review not from her team leader, Sakellakis, but from Erwin and Mittelholzer, scheduling Plaintiff's review meeting for March 9, 2018. Plaintiff asked Erwin if her team leader, Sakellakis, would be present at the review meeting and was told that Sakellakis was unavailable. Erwin and Mittelholzer held the meeting without her direct supervisor.

68.     During Plaintiff's March 9, 2018 review, Plaintiff for the first time was told of alleged performance issues.   At no time prior to Plaintiff's January 2018 meeting reporting the sexual harassment and expressing her concerns regarding the hostile work environment had Plaintiff been told of alleged performance issues.

69.     After the March 9, 2018 review meeting, Erwin began to treat Plaintiff differently from other employees by changing Plaintiff's work duties, implementing different working hours, and requiring management approval for routine matters being handled by Plaintiff.

70.     On April 16, 2018, one week after Defendants' major client advised it would do nothing about Lopez's conduct and would not remove Lopez from the accounts with Defendants, Plaintiff was terminated under the pre-text that Plaintiff had violated Defendants' Code of Business Conduct, allegedly by sharing disparaging comments about Defendants to Joey Hayles at Defendants' client, Crestwood Midstream Partners.

## KNOWINGLY FALSE STATEMENTS

71.     The allegedly disparaging comments asserted to have been made by Plaintiff were not in fact made.  In an internal memoranda dated April 12, 2018, Defendants documented

15

and published these false and defamatory statements allegedly made by Plaintiff. The memoranda, stated to have been written by Blake Koen, contained statements attributed to Hayles of Crestwood Midstream Partners, but Mr. Hayles has denied in a recorded statement making that allegations attributed to him.

72. The allegations contained in Defendants' April 12, 2018 memoranda served as Defendants' sole reason for terminating Plaintiff. The sole reason ever provided to Plaintiff or the Texas Workforce Commission for Plaintiff's termination was the allegation of Plaintiff making disparaging statements to Mr. Hayles at Crestwood Midstream Partners, which statements she never made.

73. The statements attributed to Hayles of Crestwood Midstream Partners are statements Hayles denies making. Hayles has confirmed in a recorded confirmation that the allegations attributed to him are not statements he made.

74. Further, Hayles directly confronted Bruce Jefferis, CEO of Defendants' Houston office regarding the statements. In a meeting Mr. Hayles had scheduled with Jefferis and Koen, Hayles brought up issues relating to Plaintiff and directly asked whether he, Hayles, had anything to do with the termination of Plaintiff. Jefferis responded stating that Hayes played no role in the termination of Plaintiff. Jefferis then went on and falsely stated that Plaintiff was terminated for performance issues, a defamatory statement made to an industry executive that was contrary to the sole stated reason for Plaintiff's termination.

**TEXAS WORKFORCE COMMISSION**

75. After her wrongful termination, Plaintiff filed for compensation with the Texas Workforce Commission, and Defendants opposed her requested relief.

16

677286

76.     The Texas Workforce Commission required Defendants to file information regarding Plaintiff's termination and the reasons for her termination.  In response, Defendants filed a memo documenting the alleged basis to support Plaintiff's termination.  That lone document was dated May 8, 2018, some 3 weeks after the termination, alleging Plaintiff made derogatory comments about Defendants to a client.  No other basis for Plaintiff's termination was alleged by Defendants.

77.     The Texas Workforce Commission denied Defendants' objection to the Plaintiff's request and awarded compensation finding that Plaintiff was not terminated for cause.

## DEFAMATION AND SLANDER

78.     Defendant Jefferis made false statements regarding Plaintiff's performance and the reason for her termination from employment with the Defendants as noted above.  In addition to the known false statements to Hayles, on information and belief, Defendant Jefferis has made similar false and defamatory statements to others in the industry. Defendant Jefferies' false statement continued to make it impossible for Plaintiff to obtain employment in the industry.

79.     On information and belief, Defendant Jefferis, following Plaintiff's wrongful termination by Defendants, has "blackballed" Plaintiff in the insurance community by making false and defamatory statements regarding Plaintiff to others within the industry.

80.     On information and belief, Defendants, including through Paul Finnett, have also told insurance industry executives that Plaintiff was terminated because she coordinated to rally women in the office regarding the hostile work environment. In addition, it was asserted Plaintiff was terminated for hiring an attorney, which is viewed by Defendants as a reason to terminate an employee.

81.     As a result of the defamation and wrongful acts of Defendants, including Defendant Jefferis, Plaintiff has been unable to secure employment in the industry, despite her nearly two decades of successful experience in the industry.

## COUNT I

### TERMINATION ON THE BASIS OF RETALIATION

80.     Plaintiff re-alleges and incorporates into count four paragraphs 1-79.

81.     Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs and usages made unlawful by Title VII, as amended. Defendants retaliated for Plaintiff's refusal to participate in on-going illegal acts, her complaints of hostile work environment, sex discrimination, and retaliation.

82.     Defendants, acting by and through their employees, maintained a policy of retaliation, in violation of the foregoing statutes against Plaintiff.

83.     If Plaintiff had not complained of Defendants' illegal practices, hostile work environment, retaliation, and sex discrimination; she would not have been terminated.

## COUNT II

### HOSTILE WORK ENVIRONMENT HARASSMENT UNDER TITLE VII

84.     Plaintiff re-alleges and incorporates into count two, paragraphs 1-79.

85.     Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs and usages made unlawful by Title VII, as amended, and directly failed to protect Plaintiff from a hostile work environment.

677286

86.    Defendants, by and through their agents, have maintained a hostile work environment in violation of the foregoing statute against Plaintiff.

87.    Defendants failed to protect Plaintiff from a hostile work environment by failing to take prompt remedial action to protect Plaintiff from her known sexual harasser, David Lopez.

88.    Defendants failed to protect Plaintiff from a hostile work environment by failing to take prompt remedial action to protect Plaintiff from the severe and pervasive vile and offensive behavior, previously discussed, by Jimmy Winters, Paul Foreman, and other male employees.

## COUNT III

## TERMINATION ON THE BASIS OF SEX

89.    Plaintiff re-alleges and incorporates into count III paragraphs 1-79.

90.    Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs and usages made unlawful by Title VII, as amended, because of Plaintiff's sex.

91.    Defendants, acting by and through their employees, maintained a policy of sex discrimination, in violation of the foregoing statutes against Plaintiff.

92.    If Plaintiff was not female, she would not have been terminated.

## COUNT IV

## DISCRIMINATION BASED ON SEX UNDER TITLE VII

93.    Plaintiff re-alleges and incorporates into count IV, paragraphs 1-79.

94.    Defendants, by and through their agents and employees, intentionally engaged in the aforementioned practices, policies, customs and usages made unlawful by Title VII,

19

677286

as amended, and directly discriminated against Plaintiff because of her sex, by harassing her and firing her due to her sex, while at the same time, failing to terminate male employees who egregiously violated company policy.

95. Defendants, by and through their agents, have maintained a policy of sex discrimination in violation of the foregoing statute against Plaintiff.

If Plaintiff were not female, she would not have been harassed, treated poorly, and unlawfully discharged.

## COUNT V

## DEFAMATION

96. Plaintiff re-alleges and incorporates into Court V, paragraphs 1 – 79.

The statements made by Defendant Jefferies, Blake Koen and Paul Finnett, described in paragraphs 78 – 81 and 85 – 88 were false, defamatory and damaging to Plaintiff. The defamatory statements set forth above are false. The truth is that Plaintiff never made disparaging comments about Defendants to Crestwood Midstream Partners, Plaintiff was not terminated for performance issues and Plaintiff never "rallied" women in the office regarding the hostile work environment.

97. Defendant Jefferies, Blake Koen and Paul Finnett made the false and defamatory statements set forth above by negligently failing to ascertain or state the truth. They either knew or should have known in the exercise of ordinary care that the statements were false.

98. Defendant Jefferis, Blake Koen and Paul Finnett published the defamatory statements, set out above, while acting in scope of their employment by the entity Defendants.

20

99. All of the persons who heard the defamatory statements understood that the statements were defamatory in the manner described above.

100. The publication of the defamatory statements were not privileged because the defamatory statements were published with knowledge that they were false or with substantial grounds for knowing that they might be false and with reckless disregard of whether they were true or false.

101. Plaintiff has suffered general damages.  As a direct and proximate result of the Defendants' publication of the defamatory statements, Plaintiff's reputation has been severely injured.  The defamatory statements have caused Plaintiff to suffer extreme mental anguish, public humiliation, and embarrassment.  Plaintiff seeks damages for these injuries.

102. Plaintiff has suffered special damages.  Because of the publication of the defamatory statements, and their effect on Plaintiff's reputation, the plaintiff is unable to obtain any alternate or comparable employment.

The plaintiff is entitled to exemplary damages from the Defendant Jefferis because he acted with the malice required to support an award of exemplary damages.

103. Defendant Jefferis acted with a specific intent to cause injury to Plaintiff or conscious indifference to the rights, safety, or welfare of Plaintiff with actual, subjective awareness that his conduct involved an extreme degree of risk of harm to Plaintiff. Plaintiff is also entitled to exemplary damages from the Defendants because the statements were made by a vice principal or employee in a managerial capacity and, in doing the acts described in this Complaint, the vice principal/managerial employee was acting within the scope of his employment.

21

## COUNT VI

### DEFAMATION PER SE

104.    Plaintiff re-alleges and incorporates into Court VI, paragraphs 1 – 79.

105.    The statements made by Defendant Jefferies, Blake Koen and Paul Finnett, described in paragraphs 78 – 81 and 85 – 88 were false, defamatory and damaging to Plaintiff.

106.    These defamatory statements constitute slander per se because they asserted that Plaintiff was guilty of gross professional misconduct.

Defendant Jefferis, Blake Koen and Paul Finnett published the defamatory statements, set out above while acting in scope of their employment by the entity Defendants.

107.    The defamatory statements set forth above are false.  The truth is that Plaintiff never made disparaging comments about Defendants to Crestwood Midstream Partners, Plaintiff was not terminated for performance issues and Plaintiff never "rallied" women in the office regarding the hostile work environment.

108.    Defendant Jefferies, Blake Koen and Paul Finnett made the false and defamatory statements set forth above by negligently failing to ascertain or state the truth.  They either knew or should have known in the exercise of ordinary care that the statements were false.

109.    All of the persons who heard the defamatory statements understood that the statements were defamatory in the manner described above.

110.    The publication of the defamatory statements were not privileged because the defamatory statements were published with knowledge that they were false or with

22

substantial grounds for knowing that they might be false and with reckless disregard of whether they were true or false.

111.   As a direct and proximate result of the Defendants' false and defamatory statements, Plaintiff has endured shame, embarrassment, humiliation, and mental pain and anguish.  Additionally, Plaintiff has and will in the future be seriously injured in her reputation, good name, standing in the community, and will be exposed to the hatred, contempt, and ridicule of the public in general as well as of her business associates and clients.  Consequently, Plaintiff seeks actual damages in a sum within the jurisdictional limits of this court.

112.   As a direct and proximate result of Defendants' publication of the defamatory statements, Plaintiff has suffered damages consisting of inability to obtain alternative or comparable employment.

113.   The plaintiff is entitled to exemplary damages from the Defendant Jefferis because he acted with the malice required to support an award of exemplary damages. Defendant Jefferis acted with a specific intent to cause injury to Plaintiff or conscious indifference to the rights, safety, or welfare of Plaintiff with actual, subjective awareness that his conduct involved an extreme degree of risk of harm to Plaintiff.

114.   Plaintiff is also entitled to exemplary damages from the Defendants because the statements were made by a vice principal or employee in a managerial capacity and, in doing the acts described in this Complaint, the vice principal/managerial employee was acting within the scope of his employment.

## **RELIEF SOUGHT**

## DAMAGES

115.   As a direct and proximate result of the aforementioned acts, Plaintiff has suffered reputational damages, loss of wages, both in the past, present, and future, as well as compensatory damages, including but not limited to emotional distress.

## EXEMPLARY DAMAGES

116.   Defendants' actions were intentional, willful, harsh, oppressive, reckless and malicious, and as a further and proximate cause, Plaintiff has suffered severe emotional distress, pain and suffering. The wrongs done by Defendants were aggravated by their willfulness, wantonness and maliciousness for which the law allows the imposition of exemplary damages. Plaintiff, therefore, seeks exemplary damages in a sum to be determined by the trier of fact to serve as punishment to deter

117.   Defendants from such conduct in similar situations.

## ATTORNEY'S FEES

118.   Defendants' actions and conduct as described herein and the resulting damage and loss to Plaintiff has necessitated Plaintiff's retaining the services of attorneys, in order to initiate this proceeding. Plaintiff seeks recovery of reasonable and necessary attorney's fees.

## JURY DEMAND

119.   Plaintiff hereby makes her request for a jury trial.

## PRAYER

120.   WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendants be cited to appear and answer, and that on final hearing of this cause, Plaintiff has the following relief:

24

a.      Back Pay;

b.      Pre-Judgment Interest on Back Pay;

c.      Front Pay;

d.      Compensatory Damages, including but not limited to reputational damages and emotional distress;

e.      Punitive Damages;

f.      Attorney's Fees and Costs;

g.      Such other and further relief, at law or in equity, general or special, to which

Plaintiff may show she is justly entitled.

Dated: October 25, 2019               Respectfully submitted,

*/S/ Fred Hagans*

**Fred Hagans**
Attorney In Charge
State Bar No. 08685500
S.D. Tex. ID No. 2457
fhagans@hagans.law

3200 Travis, Fourth Floor
Houston, Texas  77006
Telephone: (713) 222-2700
Telecopier: (713) 547-4950

**Of Counsel:**

**Kendall C. Montgomery**
State Bar No. 14293900
S.D. Tex. ID No. 4206
kmontgomery@hagans.law
**Hagans Montgomery & Rustay, P.C.**
3200 Travis, Fourth Floor
Houston, Texas  77006
(713) 222-2700
(713) 547-4950 (Fax)

25

677286

**Keith Taunton**
State Bar No. 19681100
S.D. Tex. ID No. 5372
ktauton@tsplaw.com
**Taunton, Snyder & Parish**
580 Westlake Park Blvd., Suite 1120
Houston, TX 77079
Telephone: (713) 961-5800
Telecopier: (713) 993-2308

**Vincent L. Marable, III**
State Bar No. 12961600
S.D. Tex. ID No. 10385
trippmarable@sbcglobal.net
**PAUL WEBB, P.C.**
221 N. Houston
Wharton, Texas  77488
(979) 532-5331 / (979) 532-2902 (Fax)

ATTORNEYS FOR PLAINTFF MARIANELA MENA

## CERTIFICATE OF SERVICE

The undersigned certifies that the First Amended Complaint was filed electronically in compliance with Local Rule CV-5.1. As such, this document was served on all counsel of record who have consented to electronic service on this 25th day of October, 2019.

_____*/S/ Fred Hagans*_____
**Fred Hagans**

677286